Okay, our next case this morning is 23-2437, Recentive Analytics, Inc. v. Fox Corporation. Okay, Mr. Fredrickson. Good morning, Your Honors, and may it please the Court. Robert Fredrickson on behalf of Recentive Analytics. This case involves a practical and concrete application of a technology that's changing our world today, artificial intelligence and machine learning. The Recentive was the first to discover and recognize... Why isn't this a patent just to the use of machine learning generically in this particular area, network schedules or whatever? Two answers to that question, Your Honor. The first is the field of the generation of network maps and event schedules was a crude and unsophisticated field. So no one before Recentive had thought to apply this specific technical solution in this specific field of endeavor, which is something that the Court has looked at. We've held repeatedly that the fact that you use computers in a new area doesn't create something that's patentable under 101. Exactly. So what's different about the machine learning here? The way it's described, it sounds like conventional use of machine learning. The specification talks about various kinds of machine learning, various kinds of AI that can be used. It doesn't specify a particular one. So with respect to the machine learning training patents, it does specify and specifically claim particular machine learning models. It also specifically claims and identifies the input data and the target features that are going to be used to train this model. But to answer the fundamental question, what this Court's jurisprudence is really focused in on when it comes to this Section 101 inquiry, and something Your Honor has noted in previous decisions, is that are these patents that claim just the result, just the optimized and dynamic network maps, or do they claim a new process for obtaining those network maps? And what machine learning is — So what's the new process? The new process is the application of machine learning to what was this crude and unsophisticated process that was being used in the prior art. Okay, but that's just applying a conventional process to a new field, which is exactly what we've held is not patent eligible. But the Court and the Supreme Court has also recognized that inventions often rely on building blocks that are drawn from other endeavors and other fields of view, other fields of inquiry. Yeah, they've talked about that in the obviousness context. Yes, that's a sound principle, but how does it apply here? Well, it goes directly to Judge Dyke's question about whether you're talking about what is inventive in a particular field. You're looking to what that industry, and this is what the Court said in contact extraction when we're talking about the Step 2 industry, what is that particular field being done? Okay, so just to be clear, your assertion is that this was conventional machine learning, but what makes it patentable is it was being applied to a new field. Among other things, the machine learning patents also identify particular input data that was not being used by these conventional subjective processes. What do you mean input data? You mean input data relating to network maps? Exactly. The event parameters that are being identified as being what is the training data that's being used to achieve these optimized maps, and what are the outputs? What are we going to be looking for? And what machine learning does, it's not just do what people have been doing in a computer using general processors, but it's effectively a special purpose computer. It's a new form of programming what people in this industry had not been doing before. And they do that by first getting historical training data of what these event schedules and what these network maps look like. And they try to, through an iterative training process, input the input data. So these are process steps, Your Honor. And the machine learning algorithm, the specific— But the idea of training the AI is conventional, right? It was known. Absolutely, Your Honor. It was known. And this wasn't an invention of a new machine learning technique, because that would fall into another one of this Court's Section 101 traps, is if the claim is improving the mathematical algorithm or making machine learning better, then we're claiming the natural law, the mathematical algorithm itself. And what these patents do are claim the— It's not claiming that. It's not claiming that.  It's claiming the application of the— This case seems quite close to me to the most very recent 2023 case of Trinity. The other side cites it repeatedly, including charge point and electric power. So in Trinity, as I recall, we were dealing with kind of the same general notion about taking all this polling data and playing around with it and doing it in real time, as you argue here, that that must make your invention special. And the Court rejected all of those arguments under 101. Yeah, understandably, because what the Court in Trinity found was lacking in those claims, and in particular the claims, not the specifications, was anything that tethered how to accomplish the result that was being claimed. And what the machine learning training patents do is they specify a process that say, we are not claiming just real-time application or updating of maps that we would concede is abstract. We are not claiming automated network maps, optimized network maps, but how to achieve them. So we're not preempting all ways to use computers to achieve these optimized maps, but the specifically claimed use of the machine learning algorithms using the specifically claimed input data that's associated with training data to recognize features that people doing it in the prior art were unable to identify. Attendance, profitability, quantifying. That wasn't in the prior art? It was not in the prior art because the people lacked the capacity to understand how something like weather or gambling or some of the inputs that are identified in the specification, how that activity actually translates to those output features. People were making these network maps and coming up with broadcast schedules based on their crude, subjective thoughts about human behavior. And so this was effectively, and I submit Judge Prost, this case is much closer to the McRow line of cases because McRow was a selective process. Let's stick with Trinity, and at least in various places. But in Red Reef 24, your friend asserts that despite your assertion that the claims explain how to improve software functionality, the claimed machine learning techniques and models are couched in purely results-oriented language without any explanation of how the claimed machine learning technique model carries out the steps, other than machine learning algorithms doing what machine learning algorithms do. I read it the same way she does or he does. So can you tell me why that's wrong? Because those steps matter. And when we talk about what is the abstract idea and how you characterize the claims, it's the court looks at what the result is. And so the result is the output of the map. But the steps of how you get there, taking specified data, feeding it into one of these specified models, tailoring it to a particular output parameter. Isn't the bulk of our 101 jurisprudence where we found ineligibility dealing with precisely those things? All it does is collect the information and do this with the information, et cetera, et cetera. Those are kind of standard terms that we use in our cases where we find ineligibility. Exactly, but this court has never addressed the application, a practical and concrete application of machine learning in a field that never thought to use it before. Okay, so that suggests to me that you're saying that any time people use machine learning, applying it to a field where it had never been used before, they could get a patent on it. Not any time, Your Honor. And certainly I don't want to take on more than I need to in terms of all the possible iterations and how fast. Lots of times? Frankly, sure, Your Honor. There should be lots of times. But fast doesn't matter. That's part of the problem because I'm receiving questions about machine learning, doing what machine learning does. Machine learning has only been around in practically. But you didn't invent machine learning. Correct. The concepts that existed in academia and in research and in literature, but people couldn't figure out how to bring those tools to bear, how to make practical applications. And we're only seeing that today in different areas. And people are excited about and talking about all the things that machine learning and artificial intelligence can do. And so to foreclose the notion that people recognizing a new application of this very powerful tool to all these potentially future areas of endeavor is, I submit, a scary proposition for people working in this field. So I don't want to say that every possible application of machine learning in every possible field is going to be subject to patent eligibility. And there very merrily will be.  But what's your limiting principle? I mean, you just did say that the fact that it's machine learning and it's introducing it, that's sufficient to claim eligibility. But then you said, I don't mean to say that it applies in every field. So what's the limiting principle? Why would it apply in this case and not in every other case? Well, it's been hard to – there have been few limiting principles when it comes to Section 1 jurisprudence. And so I would submit that when it comes to these types of inventions that do claim a how, and you may think that it's just a use of machine learning, but it is a how, and it is different than what was being done in the industry, that you take up those cases on a case-by-case basis. Here we have a very unsophisticated prior art system that Fox admits was less sophisticated than what the output is. There is a concrete improvement. The application of these machine learning models allows the network map makers to react in real time. We're not just saying react in real time and tell you how. It's by training – Yeah, but your problem is that with respect to computers, the same thing could be said. There are computers that are applied to new fields. People sought patents on computerizing various kinds of data processing. And we've said that merely applying a computer to a new field, a conventional computer to a new field, is not patent eligible. Why is this different? Because where's the line drawing on that side of the calculus? Computers, I agree, general purpose computers, receiving data, analyzing data, outputting data, use a computer to do it. That falls. That's Judge Prost's long line of cases that this Court has held as patent ineligible. This series of claims focuses on a particular use of those computers. And in McGrow and in Konoclicka, the Court didn't grapple with how sophisticated or how unsophisticated the rules were in those cases. In McGrow, the rule that got the patentee over the Subject 101 hump was basically associating the facial expressions with time. And the defendant in that case said, well, you didn't tell us any specific rules. You didn't claim any specific rules. And what the Court said was that's okay because it was a genus of rules that were being created. That claim didn't preempt all ways of using computer. It didn't preempt all rules to doing 3D animations. The same is absolutely true here. These claims do not present all uses of machine learning. They do not preempt all uses of generating optimized network maps. And they don't generate and they don't preempt all uses of computers. I see I'm into my rebuttal time. Okay. You want to save it? Mrs. Akara? May it please the Court, Ranjani Acharya for the Appellee's Health Corporation. Sorry. No problem. Unless there are questions, I'd like to pick up where my colleague left off, which is the idea that recentive here has applied machine learning to what they previously characterized as a previously unsophisticated process. My friend said people couldn't figure out how to bring these tools to bear until recentive came along. Now, I think recentive should be justly proud of its commercial success. They've been the first to offer a technology that the market has reacted to. That's not the question in a one-on-one analysis. Well, how is this different than McRow? He seems to rest heavily on McRow. Well, with respect to McRow, the claims at issue in McRow really dealt with taking something that was done using subjective human inputs and using the computer, the functionality of a computer, in order to change the process and to improve the display in some way. The claims at issue here don't actually, if you look at the language of the claims, there's no improvement to computer functionality that's recited. What's recited is taking known types of data, training a machine learning model to recognize what the claims describe as relationships, identify relationships in that data, and then create a network map or event schedule that's optimized to prioritize attendance, maybe viewership in a certain demographic, et cetera. So things that were known to routine processes that were done before, but now applying machine learning techniques to them. And with respect to the machine learning training patterns, certainly the claims do specify two particular types of machine learning models, but they don't recite any particular improvement on those machine learning models. The specification makes it clear that the models in question are known techniques, excuse me, that were conventional in the art. And Recentev told the patent office during the prosecution of the machine learning training patents that this idea of iteratively training to improve the model's accuracy is doing what machine learning does, and that's at Appendix 355 in the prosecution history. So unlike McCrow, I think this case is a lot closer to the SAP decision of this court, where this court did distinguish McCrow. In SAP, this court looked at methods for performing statistical analyses of investment information. And the court said there it was selecting information, analyzing it using mathematical techniques, reporting, displaying the results. That is all abstract. And the court distinguished McCrow, which was directed to the creation of something physical, how the physical display operated to produce better quality images. That's not what we're talking about here. The language of the claims doesn't say take these concrete steps in order to improve machine learning. It doesn't say take these concrete steps to identify patterns that were not available to humans before. All the claims say is input two kinds of data, iteratively train the machine learning model to identify relationships, give it a weight for a certain parameter that you're interested in, and then have it generate a network map or event schedule that is optimized for that feature. So this is a lot closer to SAP than McCrow, and the reasoning of SAP applies equally here. And the district court's opinion dealt with a lot of arguments made with regard to McCrow, right? Correct. And the district court also relied heavily on Trinity. Yes. So are you familiar with that case, and do you think that case compels the result here? Yes, Your Honor. I think it certainly serves as a very useful guidepost, and the district court did discuss it extensively in the order as well because the case had just come out. And the reason I think it applies very strongly here, or is a good guidepost here, is in Trinity you had this idea of real-time polling. So this is technology that as computers improve, as machine learning algorithms become more powerful, you're able to do these types of analyses in real-time that perhaps were not available to prior art systems. And in Trinity this court held correctly that doing something in real-time is shorthand maybe for saying, do it faster or more efficiently than what a human can do it. And we've known since Alice that using a computer functionality that is running on basic, generic computer hardware, known computer technology with no improvements to that functionality, to do something that is faster or more efficient, quicker than what a human can do by looking at real-time data, that's just not sufficient. And so this is not really an outlier case. I think this falls very neatly within the line of cases, including Trinity most recently. If I may continue, I also heard my colleague mention that the key technology point here is that the machine learning is being applied to special types of data, event parameters, target features. And the specification makes it very clear that these are in fact known types of data. When we talk about event parameters, we are looking at attendance, we're looking at the schedule of a particular performer. When we're talking about target features, it's things like profits, maximizing viewership in a particular market or a demographic. So there isn't anything in the claims that applies machine learning to a very specific type of data. What we're left with is exactly what your honors pointed out. We have here generic off-the-shelf computers running known machine learning technologies. The claims say just have the machine learning, do what machine learning does, and apply it in this particular field. And that's just not enough. Since Alice, we've known that those kinds of field of use limitations are not enough to add an inventive concept here. I think we have spent some time today talking about the machine learning training patterns. I do want to emphasize for the report that the network map patterns, which are the other two patterns at issue in this case, lack even the narrowing limitations of the machine learning training patterns. They truly are take the NFL's network map for programming a football season and apply machine learning to it. So to the extent that the machine learning training patterns are abstract and add no inventive concept, which we believe is the case, the network map patterns are even more vulnerable. As to the remaining arguments, I am happy to rest on the briefs unless your honors have further questions for me. Okay. Thank you, Ms. Acharya. Thank you very much. Mr. Fredrickson, you have two minutes and 47 seconds. I will start with Trinity because Judge Proce, you've asked about it a couple of times. I think the important thing to do is not to take just the buzzwords out of the opinions out of context, but to look at the actual claim language at issue in that case. The claims at issue in that case required receiving user information, providing polling questions, receiving answers, and then figuring out if those answers matched other answers. And what the court found in analysis of those claims was those steps of matching questions to answers with other questions to answers, those are steps that can be performed in the human mind. And so that was the first sort of linchpin of the court's analysis in that decision. That is not at issue here because it is pleaded and doesn't appear to be disputed that the steps of machine learning are not processes that are done in the human mind. The second important thing about the Trinity decision is the court repeatedly said that those very generic and human interaction steps of matching polling questions, the claims were not tethered to any specific technological solution or did not require specialized computing components. You may think that the use of machine learning is conventional, but it is a specialized computer solution and it's a specific technical solution. It's not just do something and achieve a result in a computer. It's use a computer to train itself using specified algorithms in order to identify patterns that people can't see. Now, you contrast that with what my friend on the other side said about McGraw. And the way that she distinguished McGraw was she said, well, that was a case involved a subjective human input, the prior art. Well, that's the same true here. The prior art maps were subjective human inputs. And in McGraw, the functionality was improved of these animations by applying the rules. The same thing is true here. It is undisputed that the network maps that are generated by machine learning algorithms are markedly superior than crude, generalized, subjective maps that are being generated by humans. And that's actually reflected in the claims. The claims specifically require that the network maps be dynamic. That can't happen if a human is just guessing as to whether you want to see a Cleveland game in one geography or a Dallas game. The network maps are automated and updated in real time. The only way that's accomplished is by having a trained model that can instantaneously recognize when there's changes in input data, run it through this model that's been trained using a specific method, and output the optimal network map. And the final point I'll just make is these SAP and Stanford cases have nothing to do with the recentive patents, because those cases are all about improved mathematical algorithms. If you claim an improvement in math, if that's the inventive contribution, this Court and the Supreme Court says that falls in the realm of natural law and abstract idea. The recentive patents claim no improved math. Thank you very much. Thank you, Mr. Robson. Thank you, both counsel. The case is submitted.